THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

SUN AMERICAN BANK,                       :
                                         :
         Plaintiff,                      :
                                         :
v.                                       :         Civil Action
                                         :         No. 5:08-cv-341 (CAR)
FAIRFIELD FINANCIAL SERVICES, INC.,      :
                                         :
         Defendant.                      :
                                         :
_____  :

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Set against the backdrop of a nationwide real estate collapse, this case presents a dispute

between two banks to determine which will bear the risk of loss in a failed beachfront condominium

development in north Florida.  In November 2006, Defendant Fairfield Financial Services, Inc.,

("Fairfield") agreed to loan $21,840,000 ("the Construction Loan") to fund the construction of a 14-

unit luxury condominium project near Jacksonville, Florida.  The Borrower was Acquilus III, LLC,

a company wholly owned by Florida developer Herbert Lee Underwood.  Underwood was an

established customer of Fairfield and was the primary guarantor of the Construction Loan.  At the

time Fairfield originated the Construction Loan, its portfolio of loans to Mr. Underwood included

three loans for the purchase of raw land, totaling $12,412,500.

To reduce its overall risk exposure in the Underwood relationship, Fairfield sold

participation interests in the Construction Loan to several banks.  One of those participant banks was

a predecessor in interest to Plaintiff Sun American Bank ("Sun American").  In a Participation

Agreement with Fairfield dated February 27, 2007, Sun American's predecessor agreed to fund

1

16.056% of the Construction Loan, up to a maximum amount of $3,500,000.  Sun American continued to fund its proportion of the monthly draws on the Construction Loan until April 9, 2008.

On April 21, 2008, Sun American learned for the first time that Fairfield had lowered the credit rating of the Construction Loan three times, between May 2007 and November 2007, because of the borrower's declining liquidity.  On May 15, 2008, Sun American notified Fairfield that it considered Fairfield's failure to disclose the liquidity issues and the resulting credit rating changes to be a material default of the Participation Agreement and demanded that Fairfield repurchase the participation interest.  Fairfield refused.

Sun American filed the present lawsuit on October 7, 2008, alleging breach of the disclosure requirements of the Participation Agreement and seeking to enforce the Agreement's repurchase clause.  In response, Fairfield has filed a counterclaim, alleging that Sun American breached the Agreement by failing to contribute to draw payments after April 2008.  Both parties have filed motions for summary judgment.

Upon review of those motions, of the relevant legal authorities, and of the evidentiary materials in the record, the Court finds that there are no genuine issues of material fact and that Sun American is entitled to judgment as a matter of law.  The evidence presented by the parties, as construed in the light most favorable to Fairfield, demonstrates that Fairfield failed to comply with the disclosure requirements of the Participation Agreement.  Specifically, Fairfield breached Section 4 of the Participation Agreement when it failed to disclose material downgrades of its relationship with Underwood between May and November 2007.  Fairfield further breached Section 10 of the Participation Agreement by failing to disclose known circumstances that could have a material, adverse effect on the Construction Loan.  Upon notice of these breaches, Fairfield was obligated to cure or repurchase Sun American's participation interest under Section 13 of the Participation

2

Agreement.  Fairfield also breached this obligation.  For the reasons set forth in greater detail below, Sun American's Motion for Summary Judgment (Doc. 25) is therefore **GRANTED,** and Fairfield's Motion for Summary Judgment (Doc. 54) is **DENIED**.[1]

## I.    FACTUAL BACKGROUND

The dispute in this case turns on the interpretation of the terms of the Participation Agreement, and the background facts of this case are essentially undisputed.  Fairfield does not dispute that it changed its credit classification of the Construction Loan and its other Underwood loans three times in 2007.  At the outset of the project, the Underwood relationship was classified as a level 4, or "acceptable" risk.  Between May and November of 2007, the risk rating was changed three times, finally being rated a level 7, or "substandard" risk.

In May 2007, Fairfield reclassified the Loan from level "4" to level "5," meaning that the Construction Loan would be placed on the bank's watch list.  In September 2007, the Construction Loan was again reclassified to level "6," meaning that it was a "special mention loan."  In November 2007, Fairfield reclassified the Construction Loan a third time, to a level "7," signifying a potential loss of principal and interest.  Sun American did not learn of these changes in the credit rating until April 2008.

Each time Fairfield changed the classification, the change reflected increased credit risk on the credit relationship due to concerns about Underwood's liquidity and ability to repay.  Fairfield's concerns were based largely on information obtained in its administration of its three land loans to Underwood, information that was not available to Sun American.  Sun American did not learn about

---

[1]On May 5, 2009, Sun American filed a Motion for Leave to File a Sur-rebuttal (Doc. 49), seeking permission to respond to arguments in Fairfield's sur-reply.  The Court did not rule on the motion at the time.  Given that this Order grants Sun American's Motion for Summary Judgment, the Motion for Leave to File a Sur-rebuttal is **MOOT**.

Underwood's liquidity problems or the changes in the risk rating until April 2008, more than a year after these problems first became apparent to Fairfield.  Fairfield contends that it had no obligation to disclose its risk rating changes or information arising from the administration of the land loans, in which Sun American was not a participant.

### A.     The Participation Agreement

The obligations of Fairfield and its Participating Banks were governed by a Participation Agreement provided by Fairfield.  Stillman Dep. 42 (Doc. 30).  A copy of the Agreement is attached to the Complaint as Exhibit A.  Several provisions in the Agreement outline the responsibilities and obligations of Fairfield, as the Originating Bank, and of Sun American, as a Participating Bank. Generally, the Originating Bank is obligated to oversee and administer the loan, while the Participating Banks are responsible to make their own independent credit evaluations.

In the context of the Originating Bank's duty to administer the Loan, the Agreement requires Fairfield to provide its Participating Banks with full disclosure of information related to the credit relationship.  The Agreement's disclosure requirements are primarily set forth in Sections 4, 10, and 11.  These three provisions, read together, reflect an intent that Fairfield be completely open in communication to its participants.

In Section 4, Fairfield commits to provide written notice to the Participating Banks of any changes in the status of its credit relationship with the Borrower.  In its entirety Section 4 provides:

> 4.  <u>**Credit Condition of the Borrower(s); Access to Credit Infomation.**</u>  **It is understood and agreed that Participating Bank, and not Originating Bank, is responsible for making the ultimate credit decision through the Participating Bank's own review of information pertaining to the Loan.**  Consequently, credit evaluation performed by Originating Bank must be independently verified and supplemented by Participating Bank's review of individual Borrower(s) information with respect to each Loan, sufficient for Participating Bank to make its own credit decision with respect to its purchase of a Participation Interest in the Loan and to monitor the loan on an ongoing basis.  In the event Originating Bank decides to

terminate its credit relationship with a Borrower, *or materially downgrades its relationship with a Borrower*, Originating Bank will promptly provide written notice of such determination to Participating Bank.

Complaint, Ex. A ¶ 4 (Doc. 1) (bold in original, italics added).  Much of the controversy in this case hinges on the definition of the term "downgrade," which is not otherwise defined in the Agreement.

Section 10 of the Agreement imposes additional disclosure requirements on Fairfield.  In Section 10, Fairfield agrees to notify its participants of any "default" by the Borrower.  Section 10 provides, in its entirety:

> 10.  **Default by Borrower**.  Originating Bank shall promptly, after Originating Bank's having knowledge thereof, inform Participating Bank of any circumstances (a "***default***") which in Originating Bank's reasonable judgment: (a) constitute a material default under the Loan Documents and of the salient facts known to Originating Bank concerning such default; or (b) could have a material, adverse [effect] on the Loan or the value of the Collateral securing the Loan.  Originating Bank shall keep Participating Bank fully informed with respect to such circumstances and any actions taken by Originating Bank in connection therewith.

Complaint, Ex. A ¶ 10.  Section 10 specifically defines "default" to include not only actual default under the terms of the  loan agreement, but also more broadly to include any circumstances that "could have a material, adverse effect on the Loan."   Fairfield is expected to keep its participants "fully informed" of such circumstances.  The disclosure provisions of Section 10 are very broad, reflecting an intent to require complete openness by the Originating Bank.

The Agreement's goal of complete openness and full disclosure is underscored in Section 11, which requires Fairfield to make its entire file available to the participants and to furnish participants with copies of all documents it receives.  Section 11 provides:

> 11.  **Files and Records**.  Originating Bank shall keep and maintain at its offices, such files and records of matters pertaining to the Loan . . . as it would were the Loan made solely by Originating Bank.  All such files and records shall be available for inspection by Participating Bank or its agent during normal business hours.  Originating Bank shall furnish to Participating Bank copies of the Loan Documents and all other documents and information Originating Bank shall receive from time

to time, whether pursuant to the Loan Documents or otherwise relative to the Loan
or the Borrower(s).

Complaint, Ex. A ¶ 11.  Read as a whole, therefore, the Agreement reflects an intent to obligate the

Originating Bank to keep its participants fully informed, essentially requiring Fairfield to provide

the participants with as much information as Fairfield itself possesses.  It does not in any way

authorize Fairfield to withhold information pertinent to the Construction Loan.

    The Agreement imposes duties on the Participating Banks as well.  While Fairfield, as the

Originating Bank, has the duty to keep its Participating Banks fully informed, the Participating

Banks have a duty to exercise their own judgment and analysis of the Borrower's creditworthiness.

In the Agreement, therefore, Sun American represents and warrants "that it has done its own due

diligence in identifying Borrower(s) and loan purposes, as well as underwriting the Loan made to

Borrower(s) under its own lending criteria."   Agreement ¶ 2.   The Agreement assigns the

Participating Bank the responsibility to monitor the loan on an ongoing basis and to do its own

independent credit evaluation in addition to the evaluation performed by Fairfield.  Thus, the

Agreement stipulates that "credit evaluation performed by Originating Bank must be independently

verified and supplemented by Participating Bank's review of individual Borrower(s) information."

Agreement ¶ 4.   The Participating Bank "is responsible for making the ultimate credit decision

through the Participating Bank's own review of information pertaining to the Loan."  Id.

    In the event of a breach by the Originating Bank, the Agreement provides a repurchase

remedy to the Participating Bank.  This remedy permitted Sun American to demand that Fairfield

buy back its participation interest upon notice of default and opportunity to cure.  With regard to

breach, Section 13 of the Agreement provides:

    13. **Breach by Originating Bank**. Participating Bank shall, in addition to all other
    remedies available to it at law or in equity, have the unilateral right (but not the

obligation) to sell to Originating Bank, regardless of regulatory or self-imposed lending limits of Originating Bank, its Participation Interest for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest, if:

    a.    Originating Bank shall fail to cure any default by Originating Bank under this Agreement within thirty (30) days after notice from Participating Bank specifying the default; . . .

Participating Bank shall have the right to maintain an action for specific performance against Originating Bank to enforce Participating Bank's rights under this Section 13.

Complaint, Ex. A ¶ 13.  In the event of breach, then, the Agreement's remedy provision allows Sun American to recover any principal it had previously advanced on the Construction Loan, along with accrued interest on that principal and other funds advanced in connection with the Loan.

### B.    Fairfield's Credit Rating System

Fairfield, like most banks, maintained a credit rating system to classify its loans according to risk.  Stillman Dep. 27-28.  Fairfield's rating system used a scale of 1 to 10, with level 1 signifying zero risk and level 10 signifying a total loss.  Id. at 28.  At the time Fairfield approved the Loan for the Acquilus III project, the Loan was classified as a 4.  Id. at 109.  Fairfield's Senior Vice President, Steven Stillman, explained that a level 4 credit "would be generally a middle market to small business, well-managed, [with an] established history, a history of profitability, but highly dependent upon bank credit."  Id. at 35-36.  A level 4 credit rating reflects an "acceptable" level of risk, "nothing . . . that can't be managed."  Hunter Dep. 27 (Doc. 31).  Stillman characterized the level 4 credit as "the bread and butter of the banking industry."  Stillman Dep. 36.

Each higher level of the rating system reflects a higher degree of risk to the bank.  A level 5 classification, known as a "watch" rating, suggests "a slight weakness, but nothing that should result in any loss on the loan."  Hunter Dep. 27-28.  A level 6 classification is known as a "special

mention," indicating a higher degree of risk due to changes in market conditions or the borrower's status, but without an expectation of loss.  Id. at 28.  At level 7, a loan is considered "substandard." A level 7 loan "has a very defined weakness that may or may not result in a loss."  Id.  A loss may not be expected to any individual loan, but some losses will be expected among the bank's entire portfolio of seven-rated credits.  Stillman Dep. 39.  A level 8 loan is classified as "doubtful," with some loss expected, and a level 9 loan is considered a loss.  Id. at 40.   Level 10 reflects an actual charge-off of the loan.  Id.

Fairfield reconsidered its risk ratings for loans on at least an annual basis.   It also reconsidered risk ratings whenever warranted by circumstances such as a change in market conditions or a change in the condition of the borrower.  Changes in the terms of credit, such as the extension of new loans to the same borrower, might also trigger reevaluation of the rating.  In cases where Fairfield had a number of loans related to one person or entity, as in the case of its loans to Mr. Underwood's businesses, Fairfield considered the entire group of loans to be a single credit relationship.  Fairfield assigned its risk ratings to the relationship as a whole, rather than to the individual loans separately.  Shearer Dep. 98 (Doc. 45).

### C.    Fairfield's Relationship with Underwood

Based largely on its previous relationship with Underwood, Fairfield considered the Acquilus III project to be a good credit risk at the outset of the condominium project.  Underwood was an experienced real estate developer and an established customer of Fairfield with a "proven track history of being able to build projects of this magnitude."  Id. at 104.   Underwood personally guaranteed the loan, as did his development company, Eagle Development, Inc.  Id. at 110.  Prior to applying for the Acquilus III Construction Loan, Underwood had fully repaid three loans from Fairfield, including two construction loans in excess of four million dollars.  Stillman Dep. Ex. 2

8

at 5.   Moreover, the project itself had the promise of success, as Mr. Underwood had already obtained purchase commitments and deposits on half of the planned units in the building.

At the time Fairfield originated the Construction Loan, Underwood also had a high net worth and substantial liquidity.   Fairfield's financial statements showed that Underwood personally had liquid assets of only $30,000, consisting solely of cash.   Stillman Dep. Ex. 2 p. 13.   In addition to this cash, Underwood had $852,919 in a checking account with the Security Bank of Glynn County, an affiliate of Fairfield.   Shearer Dep. 50-51, Ex. 42.   This account was designated as an interest reserve to fund payments on Underwood's various loans and was estimated to be sufficient to carry the debt for 1.25 years.   Id.   Fairfield also noted that Underwood expected to receive $1.3 million in net profits from the sale of units in the completed Acquilus II project.   Hunter Dep. 51-53, Exs. 30, 31.   The record does not show whether Mr. Underwood in fact realized those profits, but subsequent events suggest that he did not, or at least that the profits from the Acquilus II project were never available to apply towards Underwood's other loans.

At the time Fairfield originated the Construction Loan, Underwood's companies had three previous loans outstanding with Fairfield, all used for the purchase of raw land.   These three loans are collectively referred to as "the land loans."   Loan number 8100240, known as the "Acquilus III land loan," was a loan in the amount of $1,837,500 to pay for the purchase of the land on which the Acquilus III condominium project was to be built.   Stillman Dep. Ex. 7.   Loan number 8100243, known as the "Acquilus Waterfront Harbour loan," was a loan in the amount of $6,075,000 to fund the purchase of a 5.62 acre site for another condominium project.   Id.   Loan number 8100324, known as the "Acquilus IV loan," was a loan in the amount of $4,500,000 to pay for the purchase of yet another beachfront site.   Id.   All three loans were secured by the property they were used to purchase.   Underwood was to pay the interest accruing on these loans from his own funds, then

9

repay the loans at maturity by refinance into a development or construction loan.   Underwood also personally guaranteed each of the loans.

The Construction Loan, loan number 8100241, was "substantially different in its structure and source of repayment from the raw land loans."  Stillman Dep. 134.  Fairfield agreed to loan Acquilus III $21,840,000 to finance the construction of the condominium building on the property purchased through the Acquilus III land loan.  These loan funds would be disbursed in monthly draws to cover the expenses of construction.  The Construction Loan included an interest reserve, so that each monthly draw included an amount to pay interest on the Loan from loan funds.  Id. at 136.  The Loan was to be paid in full at maturity, upon completion of the construction, using funds obtained from sale of the condominiums or through refinance.  Like the land loans, the Construction Loan was personally guaranteed by Underwood.  Fairfield considered all four loans guaranteed by Underwood – the three land loans and the Construction Loan – to be a single relationship.  Hunter Dep. 139.  Fairfield assigned its risk ratings to the relationship as a whole, not to each loan separately.  Id.

On November 16, 2006, Fairfield's Directors Loan Committee approved the Construction Loan for the Acquilus III project.  Stillman Dep. Ex. 3.  At the same time, the Committee agreed to grant a six-month renewal on the Acquilus III land loan and on the Acquilus Waterfront Harbor loan.  Id.  The Committee also conducted its annual review of Mr. Underwood's entire financing relationship and assigned a credit grade of "4 - Acceptable."  Id.

Fairfield's extensive relationship with Underwood required it to seek participants to provide additional funding for the Acquilus III project.  Banks routinely sell participations on loans, in order to comply with legal lending limits or to avoid becoming "overly concentrated with one customer or in one market or within one product type."  Stillman Dep. 44.   Banking regulations limit

exposure to any particular borrower to prevent negative impacts on a bank's financial conditions. Hunter Dep. 35.  In addition to the limits imposed by the regulation, Fairfield had its own internal hold limits, used to determine whether a loan had to be participated.  Id. at 34.  For the Acquilus III Construction Loan, Fairfield sold participations in the amount of $15,252,500, limiting its exposure to $6,587,500.  See Stillman Dep. Ex. 7.  Fairfield also sold participations in the Acquilus IV loan and the Acquilus Waterfront Harbor loan.  Id.

Among the banks Fairfield solicited for participation in the Construction Loan was Sun American.[2]  Fairfield's Loan Sales Manager, Stacy Shearer, had primary responsibility for soliciting banks to purchase participation interests and for communicating with the Participating Banks.  She had a connection with Reid French, a banker at Sun American whom she met while previously employed with another bank.  Shearer Dep. 22.   On December 4, 2006, Shearer sent an email to various potential participants, including Sun American.  In her email, Shearer described the Acquilus III project and explained that the project's principal, Underwood, "has been a customer of Fairfield Financial since 2001 and has proven to be a very experienced developer/contractor providing substantial strength with over $19MM in net worth and $882M in liquidity."  Id. Ex. 40.  French responded the next day, stating that Independent was "in for $3.5mm," and asking Shearer to "send over the financial material."  Id.

Underwood's liquidity was an important consideration in Sun American's decision to participate in the Construction Loan.  The financial documents that Fairfield sent to Independent

---

[2]Fairfield actually solicited Independent Community Bank, a predecessor in interest that executed the Participation Agreement prior to being acquired by Sun American.  For the sake of convenience, the Court refers to Plaintiff throughout this Order as "Sun American."  Similarly, Fairfield has changed its legal identity since the filing of this lawsuit, but this Order refers to Defendant consistently as "Fairfield."

confirmed that Underwood had more than $882,000 in liquidity, including the designated interest reserve account.  Id. 46, Ex. 41.  Sun American's Credit Approval Request shows that it considered recourse to the guarantor, Underwood, as the secondary repayment source, after the primary repayment through sale of condominium units.  Garrett Dep. Ex. 4 p. 2. (Doc. 39).  In its analysis of Underwood's financial strength, Independent noted Underwood had cash in the amount of $882,919, including $852,919 at the Security Bank of Glynn County.  Id. Ex. 4 p. 8.  In its conclusion, the credit analysis lists the "[s]trong liquidity and net worth of guarantor" as the first of the "[s]trengths relative to the credit."  Id. Ex. 4 p. 10.

Independent's board approved the purchase of the participation interest on December 20, 2006.  The Participation Agreement was not completed and closed, however, until February 27, 2007.

### D.    Problems in the Relationship

Despite the promising beginnings of the Acquilus III project, Fairfield began to experience problems in its relationship with the various Underwood enterprises even before Independent had closed on the Participation Agreement, as Underwood's liquidity problems made it more and more difficult to meet his obligations on his various loans.   These liquidity problems soon led Underwood to become delinquent on his payments on the three land loans.  Fairfield changed the credit rating of the relationship three times between May and November 2007, first from a 4 to 5, then from a 5 to a 6, and finally from a 6 to a 7.   Fairfield never informed Sun American of the early liquidity problems, the developing delinquencies on the three land loans, or the negative changes in its credit ratings.

At first, Underwood's liquidity problems affected only the land loans, because the interest reserve on the Construction Loan made it possible for Acquilus III to pay the interest on the

Construction Loan regardless of Underwood's overall liquidity.  Eventually, however, the liquidity problems became a problem for the Construction Loan as well, as Underwood was tempted to "rob Peter to pay Paul."  Stillman Dep. 156-57.  Underwood began by seeking permission to use funds from the construction budget to pay the delinquent interest on his land loans.  In the end, Peter was in fact robbed.  In May 2008, shortly after Sun American notified Fairfield of its intent to withdraw its participation, Acquilus III took nearly $750,000 that was due to a concrete subcontractor and diverted it to unknown uses.  The company submitted two forged lien releases purporting to show that the subcontractor had been paid.  As of January 29, 2009, only $250,000 of that money had been recovered, and the subcontractor maintained a lien of $500,000 against the property.  Stillman Dep. 233.

The first hint of trouble in the relationship occurred in February 2007, just four months after Fairfield approved the Acquilus III Construction Loan and before the parties executed the Participation Agreement.  By the time Independent signed the Agreement, the $852,919 interest reserve account at the Security Bank of Glynn County had dwindled to nothing.  On February 8, 2007, Tim Finney, a credit analyst at Fairfield noted in an email that Underwood had taken approximately $180,000 from the account and had used it to pay expenses and payroll related to the Acquilus III and Acquilus Waterfront Harbor projects.  Stillman Dep. 124, Ex. 5.  This left slightly less than $60,000 in the account, a situation Finney described as "not good."  Id.  A week later, the account was empty.  On February 13, 2007, Margaret Clay notified Finney in an email that Underwood had cashed another check in the amount of $60,000, and that the Glynn County account now showed a negative balance of (-$129.03).  Shearer Dep. Ex. 50.  Finney forwarded the email to Fairfield's Vice Chairman, Jim DeWitt, who observed that it was "not good news."  Id.  Despite the importance of the interest reserve account in the loan approval documents, Fairfield never

informed Independent that the account had been cleaned out prior to the closing of the Participation Agreement.  Shearer Dep. 75-76.

Underwood's diminished liquidity led to the first reclassification of the risk rating in May 2007.  On May 23, Finney sent another email to Janel Waters, who was at the time the relationship manager for the Underwood loans.  Stillman Dep. 124-26, Ex. 6.  In his email, Finney stated that he was sending an updated Loan Approval Form ("LAF") for submission to Fairfield's Directors Loan Committee, and noted that "We will downgrade Lee to a '5' for the time being until his cash flow/liquidity improves."  Stillman Dep. Ex. 6.

The ensuing exchange among Finney, Waters, and fellow manager Jimmy Davis reflects concerns about the effect of this "downgrade" on Fairfield's relationship with the participating banks.  In her response to Finney, with a copy to Davis, Waters wrote, "I thought if we could show some cash we would leave him at a 4.  If we take him to a 5 we might lose some participants and Jim[3] was very concerned about that."  Id.  Waters and Davis then questioned whether Fairfield would be obligated to notify participants on the construction loan, given that the downgrade resulted from a renewal of a land loan.  Waters concluded by stating, "I don't know, but that was Jim's concern when he called me after committee bitching about the fact that Lee doesn't have any money – like he didn't know."  Id.  The relationship was downgraded to a 5 on May 30, 2007.  See Hunter Dep. 60-61; Stillman Dep. Ex. 7.

As the spring of 2007 turned into summer, Underwood's liquidity problems began to be manifest in his credit relationship with Fairfield, as he began to fall behind on interest payments on

---

[3]Waters refers to Jim DeWitt, Vice Chairman of Fairfield, who was apparently the relationship manager for the Underwood loans at the time.  Waters and Davis later succeeded DeWitt as the relationship manager, until Stephen Stillman took over in April 2008, as a troubled asset specialist.  See Stillman Dep. 51-52, 125-26.

the land loans.  On June 21, 2007, Finney emailed Underwood personally to notify him that the three land loans were past due.  Stillman Dep. Ex. 8.  On June 29, 2007, Fairfield prepared a Problem Loan Action Form ("PLAF") to reflect that Underwood remained 24 days past due on the Acquilus IV loan and 28 days past due on the Acquilus Waterfront Harbour loan.  Stillman Dep. Ex. 7.

As of July 10, Underwood still had not made the June payments for the Acquilus IV and Acquilus Waterfront Harbour loans.  See Stillman Dep. Ex. 9.  Janel Waters suggested that Underwood could use funds obtained as developer's fees in a draw on the Construction Loan to pay the past-due interest on the land loans.  Id.  Waters further suggested that Fairfield freeze Underwood's construction draws until the land loans were made current again, but there is no indication in the record that the Construction Loan was frozen at any time in the summer of 2007. Id.  Stephen Stillman testified at his deposition that Waters was not competent to recommend freezing draws, but conceded that a loan more than thirty days past due was "a serious matter." Stillman Dep. 145-49.

Correspondence from August 2007 indicates that Underwood was having difficulty paying his subcontractors on the Acquilus III project and was seeking to use funds from the Construction Loan to pay his interest on the land loans.  On August 6, 2007, Fairfield's draw and development manager, Bryan Barton, received an email from Patti Magnano on behalf of Acquilus III.  See Stillman Dep. Ex. 11.  Magnano wrote to request payment of the August draw.  Barton responded that the draw was held up due to the Borrower's failure to pay $100,000 to subcontractor EC Concrete.  In response to Barton, Magnano explained, "The reason that EC Concrete has not been paid is because Janel Waters wanted us to pay the interest on the other loans that we have."  Id.

Magnano's response touched off correspondence between Barton and Janel Waters about Underwood's need to pay subcontractors out of the operating expenses or general conditions budget

rather than out of the specific line items for subcontractors.  Barton concluded the correspondence by expressing his concerns that Underwood's problems in paying interest on his land loans would eventually impact his ability to pay the expenses of construction on the Acquilus III project:

> Janel,
> We are not going to get approval for this draw from our participants until we receive the lien release for the $100,000 from EC Concrete.  EC Concrete is not going to give us a lien release until they get paid the $100,000 that they submitted with the previous draw, which will be coming from the general conditions on this current draw.  I don't like where Mr. Underwood is going with this.  If he continues to draw from his general conditions to pay interest on other loans, eventually he will not be able to make payroll.

Id.  Barton's email is consistent with the concern expressed by Stephen Stillman, that Underwood's declining liquidity would place him "in a position where he has to rob Peter to pay Paul."  Stillman Dep. 156-57.  Barton goes on to suggest that Fairfield fund upcoming construction draws from the deposits paid by condominium buyers, so as to "prevent us from upsetting some of our participants."  Stillman Dep. Ex. 11.  Fairfield subsequently obtained permission from its escrow agent to take $818,676.14 from the deposits and apply it to the costs of the project.  Id. Ex. 12.  The record does not indicate that Sun American was ever notified of this transaction or of Underwood's liquidity problems in July and August.  See Stillman Dep. 157.

Despite the apparent use of Construction Loan funds to pay interest costs and the use of escrow funds to pay construction costs, Underwood again fell behind on his payments on the land loans.  On August 27, 2007, Underwood was notified that his payments on the three land loans were between 22 and 27 days past due.  Stillman Dep. Ex. 13.  In a September 24, 2007 email to her supervisor, Janel Waters stated that the delinquencies were unlikely to be cleared by month-end. She therefore recommended taking the credit rating from a 5 to a 7.  Stillman Dep. Ex. 16; Hunter Dep. 101. Jim DeWitt produced a new Problem Loan Action Form on September 27, by which time

the three land loans were between 53 and 58 days past due.  Stillman Dep. Ex. 15.  Mr. DeWitt recommended changing the credit rating for the Underwood relationship from a 5 to a 6.  Id.  The Directors' Loan Committee adopted DeWitt's recommendation and approved the PLAF on October 4, 2007.  Id. Ex. 17.  At that time, the Underwood loans were rated 6, or special mention.  There is no indication in the record that Sun American was ever notified of this change or of the ongoing problems with the three land loans.

As Underwood's liquidity declined and the three land loans fell further into delinquency, Fairfield proposed to remedy the situation by lending Underwood more money.  As Stillman observed, Underwood was "asset rich and cash poor," and the new loan was seen as a way to convert one of his assets into a temporary cash source.  Stillman Dep. 164.  The "Plan of Action" section of DeWitt's September 27 PLAF states that Fairfield's lending staff was "working on a new request to loan against an additional piece of collateral to provide working capital to Mr. Underwood." Stillman Dep. Ex. 15.

This fourth land loan came to be known as the "Spoonbill Harbor" loan.  Fairfield loaned Underwood $1,560,000, secured by a 3.25 acre tract appraised at $2.4 Million.  The proceeds of this loan were to be used to pay off a first mortgage on the Spoonbill Harbor property itself, then to pay interest on the other three land loans.  See Hunter Dep. Ex. 35, Stillman Dep. 164.  In this instance, the participants were notified.  On October 5, 2007, Stacie Shearer emailed the Participating Banks to inform them that a new loan had been issued:

> As a participant in Acquilus III, LLC we felt it necessary to inform you that Fairfield [has] just been given committee approval to fund a new loan request to an entity known as Spoonful [sic] Harbor, LLC involving Mr. Lee Underwood.  This new loan request will ultimately aid Mr. Underwood in carrying three additional credits held at Fairfield in which you are not a participant.

Hunter Dep. Ex. 35.  Shearer's email has no mention of Underwood's ongoing liquidity issues or of the delinquencies in payment on the land loans.

The Spoonbill Harbor loan was discussed at a November 8, 2007 meeting of the Directors' Loan Committee, at which meeting the Directors voted to move the Underwood relationship to a Grade 7.  The minutes of the meeting indicate that the directors were beginning to lose patience:

> Acquilus – a condition of the loan approved two weeks ago, was that Richard Collingsworth should go to Jacksonville and meet with Herbert Underwood.  Richard was to firmly tell him (and make sure he understood) that we expect this loan to pay out at the maturity in six months.  This is a request to amend that approval by allowing Richard to talk with him by phone, thus saving the time and expense of the trip.  Aggregate Debt $14,960,000.  Credit Grade 7 - Substandard.  Approved.

Stillman Dep. Ex. 18.  Richard Collingsworth was a senior credit officer at Fairfield and "a very forceful personality."  Stillman Dep. 168.   The directors' decision to get him involved reflects a conclusion that the Underwood relationship was reaching a dangerous position.

Although the Participants were notified of the Spoonbill Harbor loan, there is no indication in the record that they were ever notified of the continuing delinquencies in the land loans, the increasing liquidity concerns, or the changes in the credit rating from a 4 in May to a 7 in November. Speaking as Fairfield's representative, Stillman concedes in his deposition that Fairfield never told participants that Underwood was delinquent on his three land loans for several months prior to the issuance of the Spoonbill Harbor loan.  Stillman Dep. 178-79.

Sun American interpreted the Spoonbill Harbor loan as a sign of trouble.  On October 16, 2007, Sun American's chief credit officer, Robert Garrett, explained his concerns about the new loan in an email to Felipe Lozano, Sun American's relationship manager for the Construction Loan. Garrett expressed his opinion that the Spoonbill Harbor loan reflected a relationship in trouble:

> They are cashing out equity in another property to provide debt service funds on their existing loans.  I wouldn't call it a workout, but it's not a good thing either.

> Apparently, the momentum of their existing loans has stalled, or there is no more equity or feasibility at this time in the projects, so they're trying to build some marketing time by coming up with an interest debt carry facility through May of next year. This is not unlike what we've done with a handful of our customers. However, I don't want to be a part of this deal. I don't want to sound the alarm, but we need to find out what's going on with our deal. If Mr. Underwood is running into problems with four other projects, why wouldn't ours be in distress as well?

Garrett Dep. Ex. 6. Garrett instructed Lozano to contact Fairfield and find out more about the loan. Garrett Dep. 179 (Doc. 38). Lozano contacted Stacie Shearer at Fairfield, who stated that the Underwood relationship was fine, that Underwood "was one of our best customers, there's no problem, and this loan is in good standing." Id. 183. Shearer does not recall any conversation with participants about the new loan. Shearer Dep. 109. She concedes, however, that she did not mention Underwood's liquidity problems in her email to the participants.

In December, Sun America received another hint that all was not well with the Underwood relationship. On December 17, 2007, Jimmy Davis sent a memorandum to the participants to notify them that Fairfield was proposing an exchange of collateral. Garrett Dep. Ex. 7. According to the memorandum, Underwood had promised to deposit $1,500,000 from the sale of a piece of land known as the "Beaver Street property" into a controlled account to fund an interest reserve for the land loans. The purchaser backed out of the sale and Underwood was forced to release his 50% ownership in the property to his co-owner to alleviate his debt on the property. At Underwood's request, Fairfield agreed to release its interest in the Beaver Street property and accept in exchange a pledge on his 50% interest in three other properties. Davis recommended accepting Underwood's proposed exchange to "prevent a further deterioration in Mr. Underwood's financial condition." Id. Although the appraised value of the substituted properties was "considerably less" than the appraised value of the Beaver Street property, Davis noted that the exchange was acceptable because the loan-to-value ratio of the Construction Loan was only 80% even in the absence of the additional

19

collateral.  Id.  Besides the allusion to "deterioration in Mr. Underwood's financial condition," nothing in Davis's memorandum makes any mention of the liquidity problems Underwood had been experiencing since February or of his delinquencies on the land loans.

At one point in the summer of 2007, Fairfield almost accidentally informed Sun American of its concerns about Underwood's liquidity, when a Problem Loan Action Form was posted on a computer network available to Participating Banks.  Fairfield maintains an "extranet" imaging system designed to allow Fairfield employees and participant banks to view loan documents on-line. Hunter Dep. 73.  Participants are given a user ID and password to access documents specific to the loans in which they participate.  Id. at 74.  Originally, it was the practice of Fairfield to scan images of PLAFs onto the extranet with other loan documents.  Id. at 76.  This practice was to change after a Participant took notice of a PLAF related to the Construction Loan.

On September 6, 2007, an employee of one of the Participants in the Construction Loan, Angie Ellis of Planters First Bank, noticed the June 29 PLAF posted on Fairfield's extranet system and emailed Stacie Shearer at Fairfield to inquire about it:

> Hi Stacie,
> I pulled the most recent inspection today and saw a Problem Loan Action Form.  I know it is related to being late on 2 of the 4 loans . . . .but I have not seen an explanation to the reason he has been late.
> Anything going on with the guarantor that I need to document?
> Thank you for your help,
> ASE

Hunter Dep. Ex. 33.  The record does not show any response to this email, and Shearer does not recall what she communicated to Ellis after receiving the email.

The record does show, however, considerable internal correspondence among Fairfield's employees.  Ellis's email set off a lengthy debate about whether participants should be able to view

PLAFs on the extranet.  Shearer forwarded the Ellis email to Catherine Breitenhirt, instructing her to delete the PLAF from the extranet until further notice:

> Catherine,
> Could you pull up loan docs for 8100241 Acquilus III and delete the Problem Loan Action Form that is out there?  I had a participant bank find this today.  Please just keep this in our file and do not scan back into the imaging system until I have been able to get with Jim about what to communicate to participants prior to their discovery of this form.
> Thanks so much!
> Stacie

Id.  Breitenhirt in turn forwarded Shearer's email to Sandra Hunter, noting that "a participant . . . saw a PLAF on the Acquilus loan and it has raised questions."  Id.  Hunter in her turn forwarded the email chain to Jimmy Davis and proposed further discussion of the matter with Davis and Jim DeWitt.  Id.

The Ellis email prompted "a general discussion" about whether participants should be able to view PLAFs on the extranet system.  Hunter Dep. 77.  The conclusion of this discussion was that participants should not be notified of PLAFs.  In her deposition, Hunter offered three reasons for the decision.  First, the PLAF in question contained information about the three land loans that were not a part of the Participation Agreement.  Id. at 85.  Second, the credit rating was internal to Fairfield and might unduly influence the participating banks' own credit ratings.  Id.  Third, the PLAF was not an "end-all document," but just a "summary for discussion."  Id.

The decision was therefore made to erase all PLAFs related to credits rated at level 5.  Id. 89.  At first, only five-rated credits were removed because they involved "a little subjective judgment on what . . . the rating could be."  Id. at 90.  PLAFs for Level 7 credits initially were not deleted because at that level the credit concerns were more "defined" and most participants would already have known about the credit problems.  Id.  Later, however, "the determination was . . .

21

made to remove all of them."  Id. at 92.  The later PLAFs, the ones that changed the rating on the Underwood loans from a 5 to a 6 and then from a 6 to a 7, were never placed on the extranet or provided to the participants in any form.

Aside from the single email informing participants of the Spoonbill Harbor loan in October 2007 and the memo regarding the substitution of collateral in December 2007, there is nothing in the record to indicate that Sun American ever received notice of the problems Mr. Underwood was experiencing with his loan portfolio until April 2008.  That April, Fairfield assigned the relationship to Stephen Stillman, a specialist in managing troubled assets.  Stillman prepared a new PLAF for the five loans, in which he maintained the level 7 credit rating the Directors Loan Committee had approved in November 2007.

At his deposition, Stillman testified that he rated the loans as substandard based on the decline of the Florida condominium market.  Stillman Dep. 181.  His PLAF, however, does not refer to the market decline, but instead cites the borrower's liquidity problems, noting that the "Guarantor has been unable to keep loans without an interest reserve current" and that the borrower had to take out an additional loan to obtain cash to pay his previous loans.  Stillman Dep. Ex. 29.

On April 21, 2008, Stillman organized a conference call with representatives of the participant banks.  The purpose of the call was to introduce himself to the participants and tell them his thoughts about the loan.  Stillman Dep. 182.  During the call he informed the participants that he considered the credit to be substandard.  Id.  He also informed the participants that Acquilus III had failed to pay 2007 property taxes and did not have the resources to do so.  Garrett Dep. 160-61, Ex. 10.  Fairfield proposed using contingency funds from the construction budget to pay part of the tax bill and asked the banks to fund a "protective advance" to pay the rest.  Id.  The announcement that Underwood was in a perilous financial condition and that Fairfield had rated the loan

substandard several months earlier caught Sun American by surprise.  Regarding the April 21

conference call, Garrett explained that

> we were a little taken aback by the fact that we're hearing for the first time that the
> loan had been downgraded several months back.  And we were a little bit taken
> aback by the nonchalant approach that Fairfield gave to the participants and that
> notification of the downgrade to substandard was almost a passing comment as if
> they had no obligation whatsoever to tell us about it.

Id. at 161.  Shortly after the telephone conference, Sun American made the decision to withdraw

from participation and cease contributing to draws.

Felipe Lozano sent a letter to Fairfield dated May 15, 2007, which notified Fairfield that Sun

American considered it to be in material default of the Participation Agreement.  Lozano's letter

outlines five categories of default:

> 1) Failure to give proper notice to the participants that the underlying loan as
> well as the overall relationship with Fairfield had deteriorated to the level of
> becoming a de facto workout which merited closer scrutiny from the
> participants and more involved decision making on how to best deal with the
> rapid deterioration of the loan and the underlying guarantor.

> 2) Suddenly and without prior warnings approaching the participants and
> casually requesting additional funding to pay delinquent real estate taxes.

> 3) Suddenly and without prior warning asking the participants to approve the
> reallocation of contingency funds set aside in the construction budget to
> replenish the interest reserve.  To eliminate all contingency funds in a
> vertical construction project that is only 45% complete is an extremely risky
> proposition.

> 4) Suddenly and without warning casually advising the participants that
> Fairfield has another $14MM in vacant land loans with no viable exit
> strategy, with a debtor that has no liquidity (in contradiction to the
> information provided in the original underwriting of the subject credit), with
> the corresponding interest payments being artificially propped up by
> borrowing against the equity in another vacant land parcel, and then casually
> informing the participants that said interest reserve will be exhausted in the
> next 60 days, if not sooner.

5)     Suddenly and without warning advising the participants that the examiners downgraded the subject loan as well as the related facility to "Sub Standard" status.

Complaint Ex. B.  Lozano goes on to complain about Fairfield's "lack of transparency" in its dealings with participants, a lack "caused by the inherent conflict of seemingly administering a healthy loan while dealing with the meltdown of a $14MM vacant land portfolio with no viable exit strategy and a guarantor with no liquidity."  Id.  As a result of these alleged defaults, Sun American ceased contributing to construction draws and demanded that Fairfield repurchase its participation interest "by no later than 05/19/08."  Id.  Fairfield referred Lozano's letter to its attorneys, who responded on May 30, 2008, with a letter demanding that Sun American continue to participate in funding construction draws and threatening legal action against Sun American "and all those personally involved."  Complaint Ex. C.  Sun American sent a second notice of default and demand for repurchase in September, then filed this lawsuit in October.

## II.    FAIRFIELD'S BREACH OF CONTRACT

The undisputed facts set forth above demonstrate that Fairfield breached its obligations under the Participation Agreement to provide full information to the Participating Banks, including Sun American.  Specifically, Fairfield breached Sections 4 and 10 of the contract.  Section 4 and Section 10, read together and in the context of the Agreement as a whole, reflect the intent of the parties to require the Originating Bank to provide open and thorough disclosure to Participating Banks of events and circumstances affecting the credit relationship.  The history of the credit relationship related in the testimony of Fairfield's employees Stephen Stillman and Sandra Hunter, as well as in Fairfield's internal and external correspondence, is a history of incomplete disclosure that hindered Sun American's ability to make fully-informed decisions about the progress of the project.

Fairfield first breached its obligations under the Participation Agreement when it failed to notify Sun American of its decisions to change the Construction Loan's risk rating first from Acceptable to the Watch List, then from the Watch List to Special Mention, then from Special Mention to Substandard.  Section 4 of the Agreement requires Fairfield to provide Sun American prompt written notice in the event that it "materially downgrades its relationship with a Borrower." Applying principles of contract interpretation set forth in Georgia law, the Court construes the term "material downgrade," as a matter of law, to include a negative change in the credit rating.  Such a negative change is commonly called a "downgrade," both in plain English and in the usage of the banking industry.  A downgrade in the credit rating of a loan is material to the overall credit rating. It is undisputed that Fairfield did not provide notice to Sun American when it downgraded the rating of its relationship with Underwood three times in 2007.  Fairfield's failure to disclose these downgrades was a breach of Section 4.

Fairfield also breached its obligations under Section 10 of the Agreement when it failed to provide Sun American with much of the information that supported its decision to downgrade the credit ratings.  Section 10 requires Fairfield to inform Participating Banks of any circumstances which "could have a material, adverse affect [*sic*] on the Loan or the value of the collateral securing the Loan."  This disclosure requirement was particularly important in this case, given that Fairfield possessed substantial information about Underwood's affairs that was not available to Sun American.  Sun American would not have been able to learn, on its own, that Underwood was having difficulties paying the interest on his three land loans.  In the exercise of reasonable judgment, Fairfield should have foreseen that Underwood's declining liquidity and delinquencies on the land loans could come to have a material, adverse effect on the Construction Loan. Eventually, these liquidity problems actually did have a material adverse effect on the Construction

25

Loan, as Underwood first was unable to pay his property taxes, then later used fraudulent lien waivers to divert loan funds from the construction project toward other, still unknown, uses.

A.       **Section 4 - Material Downgrades**

The Court finds as a matter of law that Section 4 of the Participation Agreement required Fairfield to notify Sun American each time it decided to change the credit rating of the Construction Loan and the related land loans.  These changes were material downgrades in Fairfield's credit relationship with the Borrower.

Because the term "downgrade" is not defined anywhere in the Participation Agreement, it must be defined according to its plain meaning or its use in the industry.  The plain meaning of "downgrade" is simply a change in status for the worse, a move from a better grade to a worse grade.  It is commonly used in the banking industry to refer to negative changes in the risk rating of a loan.   Fairfield's "downgrades" of its risk rating were "material" to the value of the Construction Loan and were changes in the "credit relationship with the borrower."  As such, Fairfield's failure to disclose them to Sun American was a breach of the Participation Agreement.

The construction of the Participation Agreement presents a question of law for the Court. Georgia courts have outlined three steps for the construction of contracts:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

Lostocco v. D'Eramo, 238 Ga. App. 269, 275, 518 S.E.2d 690, 695 (1999).  In determining whether a policy is unambiguous, "words in the policy must be given their usual and common signification and ordinary meaning."  Greater Ga. Life Ins. Co. v. Eason, 292 Ga. App. 682, 685, 665 S.E.2d 725,

728 (2008).  "Ambiguity exists when the meaning is uncertain, and the language may be fairly understood in more than one way." Lostocco, 238 Ga. App. at 275, 518 S.E.2d at 695.  In this case, the Court finds that the term "downgrade" is unambiguous, and any ambiguity that might exist can be resolved by applying the rules of construction laid out in Georgia law.

The plain meaning of the word "downgrade" supports a construction requiring Fairfield to disclose its risk rating changes.  The compound form of the word itself indicates that it means to change the grade of something for the worse.  The Oxford English Dictionary defines "downgrade" as a transitive verb meaning "to lower in grade, rank, status, estimation, or the like." Oxford English Dictionary (3d ed. 1989).  A risk rating is nothing if not the bank's grade, rank, status, or estimation of the loan.

Usage in the industry further supports the plain-meaning interpretation of the word.  Under Georgia's rules of contract interpretation, "[w]ords generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."  O.C.G.A. § 13-2-2(2). Sun American's Robert Garrett testified, based on his twenty-five years of experience in the lending business, that moving a loan from a pass rating to the watch list constitutes a material downgrade. Garrett Dep. 154-55.  Fairfield's own witnesses conceded as much.  When asked whether a change in the risk rating from a four to a five would constitute a downgrade, Sandra Hunter testified, "For my purposes, it's referred to as a downgrade when it refers to the credit rating risk.  But, I mean, it could be - - it depends on what context you - - you use it in."  Hunter Dep. 31.  Hunter further testified that  "downgrade" was a term that credit analysts and bank examiners would use to refer to a change in the status of a credit rating. Id. at 126-27.  Stephen Stillman admitted that bankers

would use the term "downgrade" in "common conversation" or "common vernacular" to refer to changes in the risk rating. Stillman Dep. 30-31.

Email correspondence among employees of Fairfield confirms that Fairfield's bankers commonly used "downgrade" to refer to risk rating changes, prior to the initiation of this lawsuit. On May 23, 2007, Tim Finney wrote Janel Waters to tell her, "We will downgrade Lee to a '5' for the time being until his cash flow/liquidity improves." Stillman Dep. Ex. 6. Stacie Shearer, in an email to Hunter on September 8, 2008, asked, "Do you recall the Underwood relationship being downgraded to a 5 in June of 07?" Hunter Dep. Ex. 39.

It is in fact a challenge to talk of negative changes in the credit risk rating without using the word "downgrade." Throughout his deposition testimony, Stephen Stillman was careful to avoid use of the word. Instead of a downgrade he referred to: "a risk rating change in a loan" (Stillman Dep. 24); "a grading change from a four to a five" (Id. at 130); and "a change in the risk rating to the detriment" (Id. at 163). The Court has undertaken the same exercise in its outline of the facts of the case. In seeking to state the evidence in the light most favorable to Fairfield, the fact section of this Order avoids the use of the word "downgrade" in favor of more neutral terms such as those used by Stillman. It was a challenging effort and required some awkward phrasing. "Downgrade" is simply the most natural term to describe a negative change in the grade of a loan.

The three downgrades of the Construction Loan's rating were "material" and related to the "relationship with the Borrower." When Fairfield downgraded its risk rating, it changed the grade it assigned to the entire relationship with Underwood. See Hunter Dep. 139. All of the Underwood loans were assigned a single risk rating. These downgrades were "material," in that they were significant to the status of the credit relationship and of such a nature that knowledge of the

downgrades would affect Sun American's decision-making.  See Black's Law Dictionary 998 (8th ed. 2004).

Fairfield's internal correspondence indicates that Fairfield's bankers were aware that knowledge of the downgrade could affect Sun American's decision-making.  When first discussing the possibility of downgrading the Underwood relationship to a level 5 in May 2007, Janel Waters wrote, "If we take him to a 5 we might lose some participants."  Stillman Dep. Ex. 6.  Later, when another participant emailed with concerns about the June 29 PLAF posted on the extranet, Fairfield employees expressed concern about participants having access to that information.  According to Sandra Hunter, one reason for the decision to remove the PLAF from the network was that Fairfield "didn't want to unduly influence any participant in their decision for . . . just having a risk rating out there."  Hunter Dep. 85.

Although the plain meaning of the term "downgrade" would include a downgrade in a bank's credit risk rating, Fairfield has attempted to introduce ambiguity by proposing an alternate, more restrictive definition of the term.  At his deposition, Stephen Stillman testified that he considered the contract term to apply only to a concrete change in the terms or structure of the loan.  When asked about the meaning of "downgrade," Stillman explained that

> In the context of our conversation today and the participation certificate in our responsibilities thereof, it would be to change the way we handle a loan in that we ask for more equity, we change interest rates, we change advance rates, we might decrease the amount of credit available.  There is an overall structure due to a weakness in the loan; overall structural change.

Stillman Dep. 26. Stillman acknowledged that "downgrade" was also used in the banking industry to refer to changes in the risk rating, but explained that this usage was not "the technical vernacular." Id. at 27.  "Downgrade" was used to refer to risk rating changes only "in common conversation." Id. at 30.

To the extent that Stillman's proposed narrow definition introduces an ambiguity in the contract, the ambiguity can be resolved by resort to Georgia's rules of contract construction.  One such rule is the rule of *contra proferentum*, codified at O.C.G.A. § 13-2-2(5).  Under this rule, any ambiguity in language must be construed against the drafter of the contract.  Asian Square Partners, L.P. v. Cuong Quynh Ly, 238 Ga. App. 165, 168, 518 S.E.2d 166, 167 (1999).   In this case, the Participation Agreement was a form agreement drafted or presented by Fairfield.  Stillman Dep. 120.  Sun American did not have an opportunity to change the substance of the form, other than to fill in certain blanks.  Id.  Fairfield thus had the opportunity to use a more precise or restrictive term than "downgrade," or to state its narrow definition of the term.  It did not do so.

Another rule of contract construction provides that terms should be interpreted within the context of the contract as a whole.  As the Code provides, "the whole contract should be looked to in arriving at the construction of any part."  O.C.G.A. § 13-2-2(4).  The Participation Agreement, viewed in its entirety, reflects an intent to maximize the flow of information from the Originating Bank to the Participating Banks.  Reading Section 4 in light of this overall intent supports the plain-meaning construction of the term "downgrade," rather than the narrow construction offered by Stillman and Fairfield.

The Participation Agreement assigns Fairfield primary responsibility for administering the Loan.  In connection with this responsibility, Fairfield commits to provide notice to Participating Banks not only in the event of a material downgrade or the termination of a credit relationship, but upon knowledge of any circumstances that "could have a material, adverse effect on the Loan or value of the Collateral securing the Loan."  Participation Agreement ¶ 10.  Fairfield also commits to make all files and records concerning the Loan available for inspection by Participating Banks and to furnish Participating Banks with "copies of the Loan Documents and all other documents and

30

information Originating Bank may receive from time to time, whether pursuant to the Loan Documents or otherwise, relative to the Loan or the Borrower(s)."  Id. at ¶ 11.  These provisions cover a broad range of information, indicating that Fairfield is obligated to work with its participants in a posture of complete openness.

Nothing in the Participation Agreement gives Fairfield the right to withhold information about the Loan from its participants.  Fairfield makes two arguments from the context of the term "downgrade" to support its narrower definition of the term.  First, Fairfield contends that provisions in the Agreement related to participants' independent obligations absolve it of the responsibility to notify participants of its downgrades in the credit ratings.  Second, Fairfield contends that the proximity of the term "downgrade" to the term "termination" indicates an intent that the term only apply to material changes in the terms of the credit.  Neither argument is persuasive.

Fairfield's first argument is inconsistent with the language of Section 4 of the Participation Agreement.  As Fairfield notes, Section 4 requires Participating Banks to do their own due diligence and make their own credit determinations.  By its very terms, however, the Agreement presumes that the efforts of the Participating Banks will only verify and supplement the investigations and evaluations of the Originating Bank.  Section 4 provides that

> credit evaluation performed by Originating Bank must be independently verified and supplemented by Participating Bank's review of individual Borrower(s) information with respect to each Loan, sufficient for Participating Bank to make its own credit decision with respect to its purchase of a Participation Interest in the Loan and to monitor the Loan on an ongoing basis.

Participation Agreement ¶ 4.  This clause assigns Participating Banks an independent responsibility to "verify and supplement" the credit evaluation of the Originating Bank.  In order to verify and supplement, the Participating Banks must have access to the Originating Bank's credit evaluation. The independent responsibility to verify and supplement these evaluations does not in any way

reduce the obligations of the Originating Bank to disclose information about changes in its own evaluations.

By its very terms, then, Section 4 presumes that the Originating Bank will disclose its credit evaluations to the participants, who then have the obligation to verify and supplement those evaluations and make their own determinations.  In its next sentence, Section 4 goes on to require the Originating Bank to provide prompt notice of any material downgrade in the credit relationship. This term must be read to include downgrades in its credit evaluations.

In its second argument, Fairfield contends that the use of "downgrade" in connection with term "termination" indicates a more extreme definition of the word.  Fairfield has argued that the proximity of the two terms suggests that a downgrade "can only mean decreasing the flow of credit, while not stopping it completely, *i.e.* 'terminating' it."  Def's Br. in Resp. to M. for Summ. J. 12. The context of the provision does not require such a restrictive meaning, however.  The placement of the term "downgrade" in the same sentence as the word "termination" implies at most that downgrade means something less than termination.  It is certainly true that a series of downgrades in the credit rating from "Acceptable" to "Substandard" is a steady progression in the direction of termination.

It is undisputed that Fairfield downgraded its credit evaluation of the Underwood relationship three times between May and November of 2007, but did not disclose these downgrades until April 2008.  In doing so, Fairfield breached the explicit provisions of Section 4 of the Participation Agreement and the implicit requirement of full disclosure and open communication between the Originating Bank and the Participating Banks.

### B.       Section 10 – Circumstances of Default

Fairfield not only withheld notice of its downgrades in the credit relationship; it also failed to keep Sun American informed of many of the facts that supported these downgrades.  These facts related to important events in the relationship with Underwood that increased the risk of the Construction Loan.   In withholding this information, Fairfield breached Section 10 of the Participation Agreement, which requires the Originating Bank to notify Participating Banks of "any circumstances . . . which in Originating Bank's reasonable judgment . . . could have a material, adverse [effect] on the Loan or the value of the Collateral securing the Loan."  This breach was yet another violation of its duty to maintain open communication with its participants.

Because of its long and extensive relationship with Underwood, Fairfield had superior knowledge about financial matters pertinent to the prospects of the Acquilus III project.  In addition to the Construction Loan, Fairfield administered the three land loans.  Sun American was not a participant in any of these loans and was not privy to information about their status except to the extent provided by Fairfield.  Although the land loans were distinct from the Construction Loan, involving different terms and different corporate parties, all four loans were ultimately tied to a single person, Mr. Underwood.  Fairfield considered these four loans to be a single relationship.  Problems in payment of the land loans could be a sign of coming problems with the Construction Loan, and Fairfield had an obligation to notify Sun American when it became apparent that Underwood was experiencing liquidity problems.

Signs of Underwood's liquidity problems surfaced as early as February 2007, when Fairfield noted that Underwood had taken money from an account dedicated to interest on the land loans and used it to pay operating expenses.  This transfer was an early indication that Underwood's cash flow was in danger, and it contradicted Fairfield's express representation that Underwood had sufficient

funds in the dedicated account to carry his interest obligations for 1.25 years.  By May 23, 2007, Underwood's cash flow problems were continuing and were serious enough that Fairfield found it necessary to place his loans on their Watch List.  There is no evidence in the record that Sun American was ever notified of these cash flow problems.

Shortly afterwards, Underwood's cash flow problems began to have an effect on his ability to pay his debts.  He fell behind on his interest payments on two of the land loans in June of 2007.  As his payments on these two loans approached thirty days past due, it was already a "serious" situation.  Stillman Dep. 149.  By July, the loans reached 39 days past due.  Apparently through some creative financing, Underwood was able to bring the two delinquent loans up to date.  Underwood fell behind again, however, and by the end of September he was nearly 60 days behind on all three land loans.  Mr. Stillman has conceded that there was no way for Sun American to know about these delinquencies without disclosure by Fairfield.  Id. at 84.  There is no evidence in the record, however, that Fairfield ever notified Sun American.

Fairfield's excuses for its silence are weak.  Fairfield argues that it had no duty to disclose the delinquencies in the land loans to Sun American because the Construction Loan was "substantially different in its structure and source of repayment from the raw land loans." Id. at 134.  Because of the interest reserve, Fairfield argues, the Construction Loan had built-in liquidity and there was no near-term threat of delinquency.  Id. at 136.  Fairfield's own behavior contradicts this argument.

Fairfield's response demonstrates that Underwood's liquidity problems and the delinquencies in the land loans were highly relevant to the status of the Construction Loan, despite the existence of an interest reserve.  There is a reason Fairfield considered the three land loans and the Construction Loan together as a single "relationship."  There is a reason Fairfield insisted on a

personal guarantee by Underwood, even with the interest reserve and the potential value of the collateral.  There is a reason Underwood's apparent liquidity was an important consideration to both Fairfield and Sun American in the initial loan approval process.  A construction loan is an inherently fragile and risky undertaking.  The collateral has little value until the project is completed.  In the interim, contractors must be paid and materials purchased.  Unforeseen events, such as weather problems or changing market conditions, can affect the projected costs and returns of the project. It is important that the borrower have sufficient cash flow to maintain some cushion, even when there is an interest reserve built into the terms of the loan.

Fairfield, in the exercise of reasonable judgment, should have foreseen that Underwood's early liquidity problems and delinquencies on the land loans could have a material, adverse effect on the Construction Loan.  The record indicates that Fairfield did in fact foresee material adverse effects.  As a result of Underwood's cash flow problems and subsequent delinquencies on the land loans, Fairfield downgraded his credit rating for the entire relationship from a 4 in May to a 7 in November.

Fairfield's correspondence shows that it had concerns the Construction Loan would be affected by Underwood's diminished liquidity and that it was aware its downgrades in the overall credit rating had a direct relationship to the Construction Loan specifically.  The May 23 email correspondence between Janel Waters and Jimmy Davis reflects a concern that participants in the construction loan might drop out if they learned "about the fact that Lee doesn't have any money." Stillman Dep. Ex. 6.  Fairfield thus knew that such liquidity problems could be a major concern for the participants.  Nevertheless, it failed to disclose them.

Fairfield's correspondence also shows that Fairfield foresaw exactly the sort of problems that diminished liquidity could cause for the construction project.  The primary problem likely to result

from diminished liquidity was the temptation to "rob Peter to pay Paul," that is, the temptation to divert funds from the Construction Loan draws to pay interest on the land loans or to pay operating expenses for the developer. The string of emails exchanged among Patti Magnano, Bryan Barton, and Janel Waters in August 2007 shows that Fairfield was well aware that this temptation was likely to arise as Underwood found it increasingly difficult to pay his bills. This correspondence suggests that Underwood was already seeking permission to use funds from the construction draws to pay interest on the land loans. As Mr. Barton worried, "If he continues to draw from his general conditions to pay interest on other loans, eventually he will not be able to make payroll." Id. at Ex. 11.

Fairfield's hasty attempts to suppress the PLAFs that were placed on the extranet system are further evidence that Fairfield knew the land loan delinquencies were relevant to the Construction Loan. Fairfield now attempts to explain that it decided to remove all PLAFs from the system out of concern for the confidentiality of its "internal risk ratings" and because the PLAFs were not an "end-all document." Hunter Dep. 85. These explanations are contradicted by the contemporary correspondence, however. The email correspondence shows that the decision to erase the PLAFs was prompted by alarm that a participant had seen them and had become concerned about the value of Underwood's guarantee. Hunter Dep. Ex. 33.

Fairfield's failure to disclose information about Underwood's diminishing liquidity and his land loan delinquencies is inexcusable. It had superior knowledge about Underwood's position, but refused to share this knowledge with participants. As a result, the participants were deprived of an opportunity to make informed decisions about their own risks in the construction project. Meanwhile, Fairfield took steps to protect its own interests in the land loans, while the participants were unable to appreciate the true significance of the Spoonbill Harbor loan and the substitution of

36

collateral for the Beaver Street property.  They were unable to foresee that Acquilus III would find itself unable to pay property taxes and would ultimately be tempted to misappropriate $750,000 from the construction project for use in unknown purposes.

The liquidity problems that first became evident even before Sun American signed off on the Participation Agreement could and eventually did in fact have a material adverse effect on the Construction Loan.  By the time Fairfield finally disclosed these problems, Underwood's guarantee was practically worthless.  Fairfield had an obligation to disclose these problems promptly, and its failure to do so was a breach of the Participation Agreement.

## III.   REMEDIES

The undisputed evidence having shown that Fairfield breached its duty to provide full disclosure to Sun American under Section 4 and Section 10 of the Participation Agreement, the question turns to the remedy for the breach.  The Participation Agreement, at Section 13, provides a specific remedy: repurchase of the participation interest.  Section 13 provides

> **Breach by Originating Bank:** Participating Bank shall, in addition to all other remedies available to it at law or in equity, have the unilateral right (but not the obligation) to sell to Originating Bank, regardless of regulatory or self-imposed lending limits of Originating Bank, its Participation Interest for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest, if:
>
> > a.    Originating Bank shall fail to cure any default by Originating Bank under this Agreement within thirty (30) days after notice from Participating Bank specifying the default; . . .
>
> Participating Bank shall have the right to maintain an action for specific performance against Originating Bank to enforce Participating Bank's rights under this Section 13.

Complaint Ex. 1 ¶ 13.  Section 13 provides Fairfield an opportunity to cure any breach.  If it is unable or unwilling to cure the breach, Fairfield must repurchase the Participation Interest at the Participating Bank's demand.  For the reasons set forth below, the Court finds that the repurchase

clause in Section 13 is an enforceable remedy.  The undisputed evidence shows that Sun American provided Fairfield with proper notice and that Fairfield failed and was unable to cure its breaches of Section 4 and Section 10.  Because of these breaches, Fairfield was obligated to repurchase Sun American's interest.  In failing to repurchase, Fairfield is now liable for its breach of Section 13.

The repurchase remedy that Fairfield included in its form Participation Agreement is enforceable as a reasonable method for restoring the parties to their original position in a situation where a breach cannot be cured and actual damages can be very difficult to calculate.  The provision is simple in its intent.  If Fairfield breaches the terms of the Participation Agreement and fails to cure its breach within thirty days, it agrees to take the risk of the project back on itself and to restore the Participating Bank to the position it was in before purchasing the participation interest.  The opportunity to cure gives Fairfield the opportunity to avoid the repurchase obligation in cases where the breach can be easily remedied.  In the event of a more serious breach, where cure is no longer possible or practical, the repurchase remedy simply allows the Participating Bank to step away from the risk.  This remedy is particularly apt in cases such as this one, where Fairfield's breach diminished Sun American's ability to evaluate and manage its risk exposure on the loan.

It is undisputed that Fairfield did nothing to cure the repeated breach of its duty to notify Sun American of downgrades in the credit relationship and of circumstances that were likely to have a material, adverse effect on the Construction Loan.  Sun American gave notice of the breach in Felipe Lozano's letter of May 15, 2008, and demanded that Fairfield fulfill its repurchase obligations under Section 13.  Rather than attempt to cure the breach, Fairfield responded with a letter from its lawyer demanding that Sun American continue to fund the Construction Loan and threatening to sue Sun American.  On September 29, 2008, Sun American's lawyer sent a second notice letter demanding repurchase.  Before Fairfield responded to that letter, Sun American filed this lawsuit.  Sun

American's May 15 notice letter was adequate to trigger the repurchase obligation of the Participation Agreement. The notice specifies the default in detail, with five numbered paragraphs outlining Fairfield's failures to disclose material information.

Sun American's notice letter was sufficient to trigger Fairfield's duty to cure or repurchase, even though the letter demanded repurchase by May 19, 2008, within just four days of the notice letter. Fairfield complains that the letter did not give it 30 days to cure. This demand does not violate the terms of the Participation Agreement. Nothing in the Agreement gives the Participating Bank the authority or responsibility to determine when cure would be effected. Regardless of what the Participating Bank demands, the Originating Bank has thirty days to cure. If Fairfield had cured its breach before June 16, 2008, it would have had no obligation under the Participation Agreement to repurchase. It failed to do so.

Fairfield did not cure its breach in this case because cure was impossible. The Participation Agreement requires *prompt* disclosure. Timeliness is critical. Fairfield contends that it "could easily have cured the alleged default by providing the information" that it had previously withheld. Def's Br. Supp. Summ. J. 12 (Doc. 54). In this instance, however, late information was as good as no information at all. By the time Sun American became aware of Fairfield's repeated downgrades, in April of 2008, Fairfield had known for over a year that Underwood was facing liquidity problems. Fairfield had watched these problems become increasingly severe and had searched for solutions to protect its own interests. Given that Fairfield had four other loans to collect from Underwood, its interests were not completely consistent with the interests of the participants in the Construction Loan. Sun American, deprived of full information about Underwood's credit risk, did not have an opportunity to participate in these discussions or attempt to protect its own interests.

By the time the information came to light in the April 21, 2008 telephone conference, there was little Sun American could do to protect its interest.  The Construction Loan was already in the position of a "workout."  Fairfield had unilaterally taken steps to protect its interests in the land loans, without input from the Participating Banks.  Fairfield had allowed or contemplated allowing Underwood to use funds from the construction draws to pay interest on the land loans.  It had also originated a new land loan to give Underwood temporary cash flow to continue paying his interest on the other land loans.  Meanwhile, market conditions had significantly deteriorated in the Florida condominium market, making Underwood's personal guarantee and promised liquidity more important than ever.  By the time Sun American learned of Underwood's liquidity problems, his guarantee was almost worthless.  Just a month later, Fairfield learned that Underwood had misappropriated over $750,000 from the construction draws and diverted them to his own use.  Most of this money has never been recovered.

As Robert Garrett testifies in his July 17, 2009 Affidavit (Doc. 57 -9), there are a number of steps Sun American could have taken to protect itself, had Fairfield disclosed the truth about Underwood's financial condition in a timely manner.  Had Sun American known that Underwood's purported $852,000 checking account was almost empty as of February 8, 2007, it might not even have executed the Participation Agreement on February 27.  Garrett Aff. ¶ 9.  Thus it might never have advance a single dime on the project.  Had Sun American known in June of 2007 that Underwood was unable to make interest payments on his land loans, it might have insisted on additional collateral for the Construction Loan.  Id. at ¶ 13.  Had Sun American known in August 2007 that Underwood was withholding payment to a concrete contractor and seeking permission to use funds from the Construction Loan to pay interest on the land loans, it might have insisted that Fairfield issue checks directly to vendors and subcontractors.  Had Sun American known in October

2007 that Underwood's loans were rated Substandard, it might have objected when Fairfield originated a new loan to obtain collateral to protect its own land loans without providing additional collateral for the Construction Loan.  Id. at ¶¶ 14, 15.   By April 2008, none of these options was of any value.

As Fairfield no doubt contemplated in drafting the Participation Agreement, the repurchase requirement of Section 13 is a suitable remedy for the breach of the Originating Bank's disclosure obligations.  The purpose of the disclosure requirements is to give the Participating Banks a full opportunity to make informed decisions about the administration of the loan and to manage its own risks.  Fairfield's failure to disclose made it the sole master of the risk, and the best remedy available is to make it bear the full burden and benefit of that risk.  The repurchase clause, therefore, requires Fairfield to take full responsibility for the loan, after it has failed to give the Participating Banks a meaningful opportunity to participate.

As Fairfield points out, the repurchase clause is difficult to categorize in legal terms.  In certain aspects it resembles a specific performance remedy, while in other aspects it resembles a liquidated damages provision.  It is similar to a liquidated damages provision, in that it requires the repayment of a quantifiable and specified amount of money.  See LaSalle Bank Nat'l Assn. v. Capco Am. Securitization Corp., No. 02 CV 9916 (RLC), 2005 WL 3046292, * 5 (S.D.N.Y., Nov. 14, 2005) (repurchase clause "provides for liquidated damages in the event that a breach cannot be cured.").  It is similar to a specific performance remedy, in that it requires Fairfield to take back possession of the Participation Interest.  See Greyhound Fin. Corp. v. TSM Fin. Corp., No. 92 C 3750, 1993 WL 294023, * 3 (N.D. Ill., Aug. 5, 1993) (repurchase clause amounts primarily to monetary compensation, but "the Court would also have to order Defendant to take possession of the defaulted loans or deduct some amount to reflect the value of the loans.").

41

Fairfield attempts to exploit this ambiguity with a dizzying argument that Section 13 is unenforceable because it provides for the equitable relief of specific performance where there are adequate remedies at law, but is also unenforceable as legal damages because it would be impossible to determine what Sun American would have done had it known of Underwood's financial condition earlier. The Court finds that it is enforceable either as specific performance or as liquidated damages. Nevertheless, following Georgia precedent the Court finds that the best remedy is to find Fairfield's failure to repurchase to be a breach of Section 13 and to award damages for its breach. Under any of the three approaches, the end result is essentially the same.

Whether repurchase is construed as liquidated damages or specific performance, it is a reasonable remedy for a serious breach with consequences that cannot be measured. Specific performance is generally available "whenever the damages recoverable at law would not be an adequate compensation for nonperformance." O.C.G.A. § 23-2-130. Specific performance may thus be warranted where "the measure of damages resulting from non-performance of the agreement is uncertain or difficult to ascertain." Greyhound, 1993 WL 294023, at * 3 (quoting Estate of Johnson, 350 N.E.2d 310, 316 (Ill. App. Ct. 1976)); see also, Gabrell v. Byers, 178 Ga. 16, 172 S.E.2d 227 (1933). Similarly, a liquidated damages provision in a contract will be enforced if "(1) the injury caused by a breach of contract is difficult or impossible to estimate; (2) the parties intend to provide for damages and not a penalty; and (3) the sum stipulated is a reasonable pre-estimate of probable loss." Lancaster v. Susa Partnership, L.P., 300 Ga. App. 567, 685 S.E.2d 474 (2009). The repurchase remedy prescribed in the Participation Agreement meets both the equitable requirements for specific performance and the legal requirements for liquidated damages.

Requiring Fairfield to repurchase the Participation Interest in this case is the most reasonable means of restoring the parties to the position they would have been in absent the breach. Precise

42

legal damages would be impossible to calculate because such calculation would require speculation into what Sun American would have done with the information Fairfield was obligated to disclose. By withholding important information over a period of several months, Fairfield deprived Sun American of an opportunity to make its own decisions about managing risk or to participate in decisions made by Fairfield.  In hindsight, Sun American can only speculate about what it might have done in February, May, August, or October of 2007, had it known the true extent of Underwood's financial difficulties.  It might have made good decisions, or it might have made bad decisions.  It might have insisted that Fairfield act more aggressively in monitoring and controlling the project.  It might even have pushed to stop the project entirely, before millions of dollars were invested.  It is impossible to say.

Where Fairfield deprived its participants of power to manage their own risk, the most appropriate remedy is to have Fairfield assume full responsibility for the risk.  Only Fairfield had sufficient knowledge to make fully-informed decisions about the Acquilus III project.  Fairfield used this knowledge to control management of the Construction Loan.  By repurchasing Sun American's Participation Interest, Fairfield bears the costs or obtains the benefits of its own risk management and cannot externalize those costs or benefits on Sun American.  The repurchase clause is not a penalty, therefore, but a reasonable attempt to address the probable loss that would occur in the event of inadequate disclosure.

Although Georgia courts have never directly determined whether a repurchase clause amounts to specific performance or liquidated damages, the Georgia Court of Appeals has twice enforced repurchase clauses similar to the clause at issue in this case.  In those two cases, the court simply treated the failure to repurchase as a breach of contract in its own right.  In the most recent case, Cleveland Motor Cars, Inc. v. Bank of America, 295 Ga. App. 100, 670 S.E.2d 892 (2008),

a bank brought suit against a car dealer for failing to repurchase loans it had sold to the bank.  In the sale agreement, the car dealer "expressly promised to repurchase the loan if a buyer's identity was fraudulent."  295 Ga. App. at 102, 670 S.E.2d at 895.  The court affirmed summary judgment in favor of the bank, finding that the dealer had breached the contract by failing to repurchase.  In an earlier case, Rod's Auto Finance, Inc. v. Finance Co., 211 Ga. App. 63, 438 S.E.2d 175 (1993), a finance company purchased auto loans from two car dealers, under an agreement that required the dealers to repurchase the loans if the debtor did not promptly commence making timely payments.  The court remanded the case to the trial court with instructions to determine whether there was a genuine issue of material fact that any debtor failed to make a timely first payment.  In the absence of a fact issue, the finance company would be "entitled to summary judgment on its claim that the seller of that account must repurchase it."  211 Ga. App. at 64, 438 S.E.2d at 176.  In both cases, repurchase was required on breach of certain terms of the agreement.  The subsequent failure to repurchase upon notice of the breach was itself found to be a breach.

Applying the approach of Cleveland Motor Cars or Rod's Auto Finance to this case would ultimately have the same result as considering the repurchase clause to be a liquidated damages provision.  The only distinction between this remedy and "specific performance" is that Fairfield would not technically have to take possession of the Participation Interest.

As liquidated damages, the damages would be calculated to place the parties in the position they would have been in had Fairfield complied with its duty to repurchase.  Fairfield would return to Sun American the full purchase price of the Participation Interest ($3,500,000), plus any fees and interest accrued to date.  Sun American would remit to Fairfield funds to pay for draws required under the Participation Agreement subsequent to Sun American's discontinuing its participation.  Sun American would retain its Participation Interest and remain obligated only to the extent

necessary to assist Fairfield in the further administration of the Construction Loan as required by the Participation Agreement.

If specific performance were ordered, Fairfield would have to take back its Participation Interest.  It would then return to Sun American all of the funds that Sun American advanced on construction draws, plus any accrued interest and fees.  The ultimate economic result is the same no matter how the remedy is characterized: Fairfield must return to Sun American the $1,904,224.35 that it advanced to Acquilus III prior to learning of Fairfield's breach, with interest and fees as required under Section 13.   That is the measure of damages for Fairfield's breach of the repurchase clause of Section 13.

## IV.      CONCLUSION

Based on the undisputed evidence, interpreted in the light most favorable to Fairfield, the Court finds that Fairfield breached its disclosure obligations under Sections 4 and 10 of the Participation Agreement. The undisputed evidence further shows that Sun American gave Fairfield due notice of its breach and that Fairfield was unable to cure its breach within thirty days.  Fairfield has since refused to repurchase the Participation Interest as required by Section 13.   Accordingly, the Court finds that there are no genuine issues of material fact and that Sun American is entitled to judgment as a matter of law.  The parties are hereby directed to confer and prepare a stipulation of damages consistent with the measure of damages defined above, to be submitted in writing with twenty days of the date of this Order.

It is SO ORDERED this 9th day of February, 2010.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

chw